**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**HUNTINGTON DIVISION**

**JAMES EDWARD ALBRIGHT,**

  **Plaintiff,**

**vs.**           **CIVIL ACTION NO. 3:20-CV-00174**

**ANDREW SAUL, COMMISSIONER OF
SOCIAL SECURITY,**

  **Defendant.**

## PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 10, 2020 (ECF No. 4), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Motion for Judgment on the Pleadings and Brief in Support of Motion for Judgment on the Pleadings as well as Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 18, 19, 22, respectively)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** Plaintiff's request for entry of an award for benefits or alternatively, remand (ECF No. 18); **GRANT** Defendant's request to affirm the decision of the Commissioner (ECF No. 22); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from this Court's docket for the reasons stated *infra*.

## Procedural History

The Plaintiff, James Edward Albright, (hereinafter referred to as "Claimant"), protectively filed his application for benefits on December 15, 2016, alleging disability since September 8, 2015[1], because of "injury to left arm that required reconstructive surgery", bilateral carpal tunnel syndrome, "multiple heart attacks requiring 2 stents", "lower back injury that required surgery", torn left rotator cuff, hiatal hernia, neck problems, acid reflux, and sleep apnea. (Tr. at 221-224, 243) His claim was initially denied on March 13, 2017 (Tr. at 88-92) and again upon reconsideration on May 31, 2017 (Tr. at 93-99). Thereafter, Claimant filed a written request for hearing on June 12, 2017 (Tr. at 100-101).

An administrative hearing was held on January 23, 2019 before the Honorable Melinda Wells, Administrative Law Judge ("ALJ"). (Tr. at 30-55) On February 15, 2019, the ALJ entered an unfavorable decision. (Tr. at 10-29) On or about March 5, 2019, Claimant sought review by the Appeals Council of the ALJ's decision. (Tr. at 198-220) The ALJ's decision became the final decision of the Commissioner on January 9, 2020 when the Appeals Council denied Claimant's Request for Review. (Tr. at 1-6)

On March 9, 2020, Claimant timely brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 2) The Defendant (hereinafter referred to as "Commissioner") filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 13, 14) Subsequently, Claimant filed a Motion for Judgment on the Pleadings and a Brief in support of same (ECF Nos. 18, 19), in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 22). Consequently, this matter is fully briefed and ready for resolution.

---

[1] Claimant subsequently amended the alleged onset date to April 6, 2016. (Tr. at 238)

**Claimant's Background**

Claimant was 50 years old as of the amended alleged onset date, and is defined as a "person closely approaching advanced age." See 20 C.F.R. § 404.1563(d). (Tr. at 23) Claimant has a high school education; he had previously worked for Worldwide Equipment as a technician, performing transmissions, engine and warranty work on 18- and 10-wheeler trucks, as well as having worked as a millwright for Steel West Virginia. (Tr. at 34-35) Claimant had also worked for BTI Contracting which included work on trucks and paving equipment. (Tr. at 35) Claimant's past relevant work was categorized as skilled, heavy and very heavy as performed by the vocational expert. (Tr. at 53)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims, 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not,

the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant establishes a *prima facie* case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981).

The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. Id. § 404.1520(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." Id. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. § 404.1520a(c). Those sections provide as follows:

> (c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such

factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart P of part 404 of this chapter for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter.

(4) When we rate your degree of limitation in these areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1). Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the

5

technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

## Summary of ALJ's Decision

In this particular case, the ALJ determined that Claimant met the requirements for insured worker status through December 31, 2020. (Tr. at 15, Finding No. 1) Next, the ALJ determined that Claimant had not engaged in substantial gainful activity since April 6, 2016, the amended alleged onset date. (Id., Finding No. 2)

At the second inquiry, the ALJ found that Claimant had the following severe impairments: degenerative disc disease of the cervical and lumbar spine; chronic obstructive pulmonary disease; coronary artery disease; and carpal tunnel syndrome. (Id., Finding No. 3)

At the third inquiry, the ALJ concluded that Claimant's impairments or combination thereof did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 18, Finding No. 4) The ALJ then found that Claimant had the residual functional capacity ("RFC") to perform light work

> except he can occasionally climb ramps and stairs, balance, stoop, kneel, and crouch; and never crawl or climb ladders, ropes, or scaffolds. He should avoid more than occasional exposure to temperature extremes, vibration, fumes, odors, dust, gas, and poor ventilation; and can never work at unprotected heights or around moving machinery.

(Id., Finding No. 5)

At step four, the ALJ found Claimant was not capable of performing his past relevant work. (Tr. at 23, Finding No. 6) In addition to the immateriality of the transferability of job skills,

6

Claimant's age, education, work experience and RFC, the ALJ determined that there were other jobs that existed in significant numbers in the national economy that Claimant can perform. (Id., Finding Nos. 7-10) Finally, the ALJ determined Claimant had not been under a disability from April 6, 2016 through the date of the decision. (Tr. at 24, Finding No. 11)

**Claimant's Challenges to the Commissioner's Decision**

In support of his appeal, Claimant asserts that the ALJ failed to fully develop the medical evidence of record with respect to both his mental and physical impairments (ECF No. 19 at 13-15). Specifically, Claimant argues that the ALJ did not consider his complaints of frequent trips to the bathroom – between 8-10 times per day, taking between 5-10 minutes (Id. at 14); that the ALJ failed to consider his complaints of ongoing problems related to his right carpal tunnel and right cubital release, his hands, his left bicep repair, back, neck and shoulder pain due to a rotator cup tear (Id. at 14-15); that the ALJ did not consider how Claimant's medication affected him; and that the ALJ ignored his issues related to irritable bowel syndrome (Id. at 15).

Claimant lists numerous impairments/diagnoses from the medical record and contends that the ALJ failed to properly evaluate these impairments in combination. (Id. at 15-16) Claimant further argues that the ALJ failed to consider the medical records of Claimant's long-time treating physicians which support Claimant's claim for disability, and complains that the ALJ instead relied upon the opinions of non-treating state agency physicians and/or substituted her opinion for those of Claimant's treating providers. (Id. at 16-17)

Claimant requests this Court reverse the final decision for an award of benefits or to remand to correct these errors. (Id. at 17)

In response, the Commissioner asserts that Claimant fails to demonstrate how the ALJ

failed to develop the record, despite having counsel who did not advise the ALJ that additional records were needed or forthcoming, and further, the ALJ assessed a generous RFC after a thorough review of the evidence of record. (ECF No. 22 at 9-11) Contrary to Claimant's assertions otherwise, the ALJ did consider Claimant's claims of frequent bathroom use, did review Claimant's treating provider records and did not err when relying on state agency opinion, as the issue of disability is solely a decision rendered by the adjudicator. (Id. at 11-13) Regarding Claimant's argument that the ALJ failed to consider the combination of effects from his impairments, the Commissioner argues that Claimant fails to explain how the ALJ erred or even provide examples as to how he met or medically equaled a Listing; nevertheless, the ALJ accounted for all Claimant's credibly established functional limitations and explained how Claimant's impairments, singly and in combination, failed to meet Listing requirements at step three. (Id. at 13-15) Finally, the Commissioner states that the final decision is supported by substantial evidence and asks this Court to affirm. (Id. at 15)

**The Relevant Evidence of Record**[2]

The undersigned has considered all evidence of record pertaining to Claimant's arguments and discusses it below.

Musculoskeletal Impairments:

In August 2015, Claimant sustained injuries to his left (non-dominant) shoulder and bicep as the result of a motorcycle accident (Tr. at 356, 452). He was assessed with left ruptured biceps. (Tr. at 357) Dr. Luis Bolano, M.D., performed a left distal biceps tendon repair on September 8, 2015 (Tr. at 361-363); Claimant recovered well from surgery and reported decreased pain with

---

[2] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings.

significant improvement (Tr. at 347-354).

During an exam with Dr. Bolano in February 2016, five months post-op, Claimant reported that he was doing well with biceps function but continued to have shoulder pain with limited function as well as numbness and tingling in both hands (Tr. at 343). Dr. Bolano assessed bilateral carpal tunnel syndrome and right-side cubital tunnel syndrome (Tr. at 344-345). Consequently, Dr. Bolano performed right carpal tunnel release surgery in March 2016 (Tr. at 342). That surgery significantly improved Claimant's symptoms (Tr. at 339-341). During a follow up examination, Dr. Bolano noted continued improvement and resolution of Claimant's neurologic symptoms (Tr. at 338-339) (neurologic normal, normal strength, normal reflexes).

Several months later, Claimant returned to Dr. Bolano on June 6, 2016 complaining of "popping" in his wrist since late May 2016, usually occurring when opening jars, grasping objects and using heavy tools at work (Tr. at 336). Dr. Bolano diagnosed left carpal tunnel syndrome (Tr. at 339); he advised Claimant to follow a prescribed strengthening exercises program (Tr. at 337).

Claimant also treated for back and neck pain (Tr. at 435). A lumbar MRI showed stable L5 spondylosis with grade 2 spondylolisthesis and associated severe bilateral LS foraminal narrowing as well as stable mild multilevel degenerative changes elsewhere (Tr. at 651). Primary care physician Russell Snyder administered trigger point injections to address Claimant's pain (Tr. at 433). Physical therapy was recommended (Tr. at 430), and initially helped with Claimant's back pain (Tr. at 39).

Claimant subsequently presented to Dwight Saulle, M.D. at St. Mary's Neurosurgery complaining of continued musculoskeletal pain (Tr. at 502-505). On examination, he exhibited 5/5 strength in his arms and legs with normal muscle tone (Tr. at 504). Dr. Saulle recommended

physical therapy and over-the-counter medications (Motrin, Advil, Aleve) (Tr. at 505). When Claimant returned several months later still complaining of pain, Dr. Saulle agreed to proceed with lumbar surgery (Tr. at 508-09, 539-544).

Dr. Saulle performed back surgery on Claimant in October 2016 without complication (Tr. at 550-552, 568-572, 709, 716-717). Post-operative imaging showed no evidence of hardware complication and no "acute vertebral finding" (Tr. at 547). In November, Claimant returned to Dr. Saulle for a post-operative check-up (Tr. at 513). Claimant reported that since the surgery, "the pain in his legs is gone," he was "walking much better," and he experienced "significant[] improve[ment]" overall (Id.). Dr. Saulle reported being "extremely pleased" with Claimant's response to surgery and noted that he "seems happy as well" (Id.). Dr. Saulle scheduled Claimant for a return visit in six months. Although Claimant continued to complain of neck pain, he reported that over-the-counter medication managed his symptoms (Tr. at 38).

Gastrointestinal Issues:

Claimant also complained of reflux and residual gastrointestinal symptoms including diarrhea. In March 2016, Claimant underwent an upper endoscopy that showed "slight" gastritis and a "moderate" hiatal hernia (Tr. at 423-424). Conservative treatment was advised (Tr. at 423), and by June 2016, Claimant reported that medication reasonably controlled his symptoms (Tr. at 408).

Claimant underwent gallbladder surgery (cholecystectomy) in 2017 (Tr. at 712). He reported in October 2017 that his symptoms, including frequent diarrhea and abdominal cramping, improved after the surgery (Tr. at 768). In May 2018, Claimant reported experiencing up to 20 bowel movements a day (Tr. at 737). However, his weight remained stable and additional testing

showed only moderate gastritis (Tr. at 736-737). Claimant's medications were continued (Tr. at 736). In September 2018, Claimant reported that his prescribed medications eased his stomach issues and diarrhea (Tr. at 750). The following month, he denied any problems with diarrhea (Tr. at 791). He also denied diarrhea during other medical visits (Tr. at 392, 428, 435, 440, 580, 604, 626, 675, 783, 793).

Cardiac Issues:

The record shows that Claimant received treatment for coronary disease years prior to the alleged onset date. (Tr. at 486-493) During an examination in March 2014, a provider noted that Claimant had a history of coronary disease for which he had undergone a heart catheterization in 2008 that had revealed non-occlusive disease. (Tr. at 19, 490) In May 2015, Claimant presented to the hospital with chest pain and shortness of breath and diagnosed with an acute inferior ST elevation myocardial infarction. (Tr. at 673) He underwent a cardiac catheterization which showed 99% stenosis of the left circumflex artery, resulting in a stent being placed as well as a temporary pacemaker. (Tr. at 474, 665, 673) Claimant did not report shortness of breath or chest pain since being released from the hospital as he was started on Effient and Crestor during his hospitalization, however, he did report "blow[ing] up easily" since his release and that his temper had increased and requested medication to help with this. (Tr. at 474) During a follow-up appointment a few weeks later, Claimant complained of trouble breathing while trying to sleep at night; it was noted that he was recovering from a recent heart attack and had been prescribed a blood thinner, accordingly, surgery was not offered and he was treated with medication. (Tr. at 476-478) A subsequent vascular ultrasound report showed an unremarkable segmental study without evidence of hemodynamically significant peripheral arterial disease. (Tr. at 20, 465)

In March 2016, Claimant presented to the emergency room with complaints of chest pain, however, testing during an examination revealed no cardiac markers and a chest x-ray revealed his heart was stable and lungs were clear, although there was mild elevation of the right hemi diaphragm but no infiltrates were present (Tr. at 20-21, 575-587, 608). A provider treatment note in May 2016 indicated Claimant was doing "reasonably well from a cardiac standpoint." (Tr. at 21, 420)

In April 2017, Claimant was seen for hypertension, hyperlipidemia, diarrhea and dyspnea; he denied headaches, visual changes, dizziness or chest pain, though reported having occasional dyspnea that was worse with heat and exertion. (Tr. at 785) It was noted that with regard to the diarrhea, Claimant had not tried over the counter medication. (Id.) By May 2017, Claimant reported having more episodes of chest pain, though not as severe as his previous angina. (Tr. at 782) He described it as an aching pain in the middle of his chest without radiation to his arm like he had before, but happens with exertion; he also reported that he had also been more out of breath and used inhalers but did not think they were helping much. (Id.) There was no palpitations or syncope, although Claimant reported that occasionally, "he feels like his heart throbs." (Id.) Although a stress test indicated basal inferolateral ischemia (Tr. at 781, 782, 774), Claimant was unable to tolerate medication and left heart catheterization was recommended (Tr. at 772).

Records from April 2018 indicated that Claimant continued to complain of increased dyspnea with exertion, but he reported only using Albuterol as needed. (Tr. at 22, 756) He also complained of frequent muscle spasms in his back and legs. (Id.) During a return visit in September 2018, Claimant reported shortness of breath with minimal exertion. (Tr. at 22, 750) It was noted that Albuterol helped relieve his symptoms; regarding his chronic diarrhea, Colestipol helped his

12

symptoms, though it caused pruritus, however none of the other medications he tried has helped. (Tr. at 750) Flexeril helped his muscle spasms, and Claimant wanted to increase the dosage; Claimant was also taking salt to help relieve his symptoms. (Id.) Cardiac testing in October 2018 revealed stable findings; it was opined that Claimant's occasional chest pain was probably not angina. (Tr. at 22, 791, 793) A chest x-ray revealed a normal heart size and clear lungs. (Tr. at 22, 797)

State Agency Opinion Evidence:

In February 2017, Narendra Parikshak, M.D., reviewed Claimant's record (Tr. at 60-63) and opined that despite Claimant's alleged impairments, he could perform light work with postural and environmental limitations (Tr. at 66-69). Specifically, Dr. Parikshak restricted Claimant to occasional climbing ramps and stairs (but never climbing ladders, ropes or scaffolds); occasional balancing, stooping, kneeling, and crouching (but never crawling); and avoidance of concentrated exposure to extreme temperatures, humidity, vibration, fumes, odors, dusts, gases, poor ventilation, and workplace hazards such as machinery and heights (Tr. at 66-67). In May 2017, James B. Smith, M.D., concurred with Dr. Parikshak's findings after reviewing Claimant's record on reconsideration (Tr. at 79-81).

**The Administrative Hearing**

Claimant Testimony:

When asked what prevents him from working, Claimant testified that he couldn't use both arms and that he has back pain. (Tr. at 36) He stated his back hurts all the time and is aggravated by walking, standing in the wrong position, bending over, or sleeping wrong. (Id.) He also has constant pain in his arms and the only thing to make it better is to not use them. (Tr. at 37) Claimant

stated he cannot lift more than six to eight pounds and cannot hold this weight for very long. (Tr. at 44) He testified that he has numbness and tingling in his hands and left elbow. (Tr. at 45)

Regarding his medication, Claimant stated he takes about 18 pills a day, including over the counter medication for pain, such as Motrin, Aleve, and Tylenol. (Tr. at 37-38) He admitted that his medication for depression helps and that his blood pressure is not completely controlled. (Tr. at 38) Claimant testified that he has side effects from his medication, including itching, decreased libido, a "tingling in my head", and dry mouth. (Id.) He also uses an inhaler one a day for his COPD. (Tr. at 41) Initially his medications caused him drowsiness, but then his body got used to them. (Tr. at 49)

Claimant stated that he received injections in his shoulder for pain which helped for a little while and that physical therapy helped with his back pain prior to having surgery. (Tr. at 39) Claimant testified that he uses a back brace about one or twice a day sometimes and that he uses heat and ice to help relieve pain. (Tr. at 40)

Claimant stated that he receives counseling for depression about every three to four months. (Id.)

Claimant denied having trouble reaching or using his hands; he denied any problems with memory, concentration or getting along with others.[3] (Tr. at 41-42) He testified that he sleeps about four hours total at night but does not take naps. (Tr. at 42) He gets shortness of breath in hot environments, if he walks uphill, and from bending over. (Tr. at 47) Overexertion causes him chest pains. (Tr. at 49-50)

---

[3] Later in the administrative hearing when questioned by his attorney, Claimant stated his medication for depression affected his sleep, concentration, appetite, and his desire to interact with others or engage in recreational activities. (Tr. at 50-51) Claimant also endorsed anxiety. (Tr. at 51)

Claimant takes medication for irritable bowel syndrome which helps "a little bit", but he still goes to the restroom between eight and ten times a day. (Tr. at 48) He endorsed a sense of urgency when he has the need for the restroom and these bathroom breaks take between five and ten minutes long each time. (Tr. at 48-49) He has issues with his hiatal hernia and reflux, which causes him pain, and it causes him to spit food back up all the time. (Tr. at 51)

Claimant denied doing any chores around the house or having trouble with self-care; for passing the time, he admitted that he goes out to eat, to the movies and to church, and he watches TV. (Tr. at 42-43)

### Vocational Expert ("VE") Testimony:

After listening to Claimant's testimony, the VE considered several hypothetical questions posed by the ALJ with regard to an individual with Claimant's functional profile (Tr. at 52-53). The VE then testified that an individual of Claimant's age, education, and vocational background who had Claimant's limitations as described in the RFC, *supra*, would be able to perform several representative unskilled light jobs that exist in significant numbers in the national economy (Tr. 53-54). The VE further stated that if the individual were to be off task for 15% of the workday, then there would be no work available. (Tr. at 54) When asked by Claimant's attorney whether such an individual was limited to standing ten minutes and then needing to sit down for five to ten minutes and able to lift six to eight pounds and only able to walk one half to one block, the VE responded that all jobs at all exertional levels would be eliminated. (Tr. at 54-55)

## Scope of Review

15

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)).  Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

As noted *supra*, Claimant has taken the position that in addition to the ALJ's failure to fully develop the evidence of record, which he contends establishes his claim for disability, especially when his impairments are considered in combination. Claimant also appears to argue that the ALJ improperly evaluated the opinion evidence, giving more credit to the opinions of non-examining physicians who only reviewed portions of Claimant's file, thus, ostensibly, they rendered opinions without the benefit of review of the complete record.

<u>The Duty to Develop the Evidence:</u>

In <u>Cook v. Heckler</u>, the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." <u>Cook v. Heckler</u>, 783 F.2d 1168, 1173 (4th Cir. 1986). The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." <u>Id</u>. The court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim in order to determine if it met the requirements in the listings of impairments amounted to a neglect of his duty to develop the evidence. <u>Id</u>.

Nevertheless, it is Claimant's responsibility to prove to the Commissioner that he is disabled.  20 C.F.R. § 404.1512(a)("In general, you have to prove to us that you are blind or disabled. You must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled." Thus, Claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment, further, the Regulations are clear that this responsibility is ongoing at each level of the administrative review process.  <u>Id</u>. The Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.  It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.  The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .  If the process ends at step two, the burden of proof never shifts to the Secretary.  . . .  It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

<u>Bowen v. Yuckert</u>, 482 U.S. 137, 146 n.5 (1987).

Although the ALJ has a duty to fully and fairly develop the record, she is not required to act as Claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-831 (8th Cir. 1994). In this case, Claimant was represented by counsel and the ALJ has the right to assume that Claimant's counsel was presenting the strongest case for benefits. See Laney v. Astrue, 2011 WL 11889, at *11 (S.D.W.Va. Jan. 4, 2011)(Eifert, M.J.)(citing Nichols v. Astrue, 2009 WL 2512417, at *4 (7th Cir. 2009). An ALJ's duty to develop the record does not require her to make specific inquiries into Claimant's treatment modalities or search for cumulative evidence; her duty is to obtain sufficient evidence upon which she can render an informed decision. Id. (internal citations omitted).

Claimant bears the burden of establishing a *prima facie* entitlement to benefits. See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.") Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

In this case, the ALJ expressly considered the medical evidence from April 2008 through October 2018[4] which included not only the consultative examiner report concerning Claimant's mental impairments, but also treatment records from his primary care providers and treating specialists for his various ailments. (Tr. at 19-22; see also Tr. at 15-18). In addition, the ALJ reviewed other evidence, which included Claimant's earnings reported in 2016 as well as his

---

[4] Presumably, the ALJ considered the evidence that long preceded the April 6, 2016 amended alleged onset date on account of the numerous exhibits attached to the written decision. (Tr. at 25-29) "Absent evidence to the contrary, it must be presumed that the ALJ reviewed all of the materials in the record and presented by the [Claimant]." Turner v. Berryhill, 2017 WL 2805498, at *4 (N.D.W.Va. June 28, 2017)(citing Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000)("[A]n ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered."). "[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in [her] decision." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014)(quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005) (*per curiam*).

statements and testimony concerning his limitations from his physical and mental conditions. (Tr. at 15-17, 19, 22) The ALJ also considered the opinions provided by the state agency consultants. (Tr. at 22) Specifically, the ALJ noted and considered Claimant's complaints with regard to his 15-20 year history of reflux, his residual symptoms of diarrhea since the removal of his gallbladder, his hiatal hernia, his problems with his left arm, his mental health issues including problems with his mood or temper, depression and anxiety, his cervical and lumbar impairments, chronic obstructive pulmonary disease, coronary artery disease, carpal tunnel syndrome, as well as his testimony regarding his history of constant neck and low back pain, complaints of numbness in both hands and feet, including his cardiac issues causing him to overheat easily, as well as his problems having shortness of breath. (Tr. at 15-19) This also included the evidence documenting the treatment for these conditions, as well as the paucity of medical treatment for his mental health allegations since the amended alleged onset date (Tr. at 22), and the evidence showing what exacerbates his pain and other symptoms – such as walking over half a block, sitting more than 15-20 minutes, lifting more than eight pounds, or standing more than 10 minutes (Tr. at 19). The ALJ also noted that the medical record demonstrated that Claimant's symptoms were largely controlled by his medication, including his stomach issues and diarrhea (Tr. at 15, 16, 22-23) or resolved and/or stabilized with more invasive, surgical treatment (Tr. at 21, 22-23) The ALJ further noted Claimant's reports of side-effects from his medication and intolerance to certain medications which affected treatment for certain conditions (Tr. at 15, 22).

Claimant does not specify what evidence the ALJ lacked in order to make an informed decision. Nevertheless, it is clear that the ALJ made numerous references throughout her decision concerning the evidence of record, which included Claimant's own statements concerning the

frequency and limiting effects of his impairments. Indeed, despite Claimant's counsel having advised the ALJ that no additional evidence was to be submitted at the time of the administrative hearing (Tr. at 32-33), it is significant that Claimant underwent a psychological evaluation in order to develop the record to assist in determining his eligibility for Social Security benefits with Emily E. Wilson, M.A. in March 2017. (Tr. at 726-731) In short, Claimant has failed to demonstrate any paucity in the evidence that would have necessitated the ALJ to further develop the record.

Accordingly, the undersigned **FINDS** that Claimant's contention that the ALJ erred by failing to develop the record is without merit.

<u>The Combination of Impairments:</u>

Although Claimant points out that the medical records indicated that he suffered from numerous impairments both mental and physical, he does not specify which impairment specifically meets or equals any Listing. The Regulations provide:

> In determining whether your physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility under the law, we will consider the combined effect of all of your impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity.

See 20 C.F.R. § 404.1523(c). When confronted with a combination of impairments, an adjudicator must not only acknowledge "the existence of the problems, but also the degree of their severity, and whether, together, they impaired the claimant's ability to engage in substantial gainful activity." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 398 (4th Cir. 1974). The Fourth Circuit has held that the ailments should not be fractionalized and considered in isolation, but considered in combination to determine the impact on the ability of the claimant to engage in substantial gainful activity. <u>Id</u>. In short, the ALJ must analyze the cumulative or synergistic effect that the various

impairments have on Claimant's ability to work. <u>DeLoatche v. Heckler</u>, 715 F.2d 148, 150 (4th Cir. 1983).

"The Listing of Impairments . . . describes for each of the major body systems impairments that we consider to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." See 20 C.F.R. §§ 404.1525(a), 416.923(a); <u>Sullivan v. Zebley</u>, 493 U.S. 521, 532 (1990). To qualify for benefits, Claimant must show that his combination of impairments is "equivalent" to a listed impairment, and he "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." See <u>Id</u>. at 531.  A claimant must meet all, not just some, of the criteria for a listing to apply. <u>Id</u>. at 530.

It is important to note that at the second step in the sequential evaluation process, the ALJ found numerous alleged impairments, both physical and mental, were not severe impairments that significantly limited Claimant's ability to perform basic work activities (Tr. at 15-18):

Regarding Claimant's problems with reflux, gastritis and a hiatal hernia, the ALJ acknowledged that despite the removal of his gallbladder, Claimant continued to have some residual symptoms, including diarrhea (Tr. at 15-16, 403, 768); however, those symptoms, including heartburn, were controlled with medication (Tr. at 15-16, 423, 408, 736, 750). The ALJ noted that by October 2018, Claimant had denied any problems with diarrhea to his treating physician. (Tr. at 16, 791-792)

The ALJ proceeded to review the evidence as it related to Claimant's left arm impairment, noting that during a motorcycle accident in 2015, Claimant had a bicep tear/rupture that necessitated surgery. (Tr. at 16, 647, 631) The ALJ noted that Claimant underwent physical

therapy afterwards, that he was noncompliant with activity restrictions,[5] but advised to slowly wean off the brace he had been wearing; the ALJ further noted that Claimant did not return to physical therapy for follow-up. (Tr. at 16) A February 2016 examination showed that Claimant reported doing well, however, he could not return to work because there was no light duty work available. (Tr. at 16, 343, 365-365) The ALJ recognized Claimant was assessed with strain of tendon and partial tear of left rotator cuff. (Tr. at 16, 345) Ultimately, the ALJ also determined Claimant's left arm injury was not a severe impairment, as it "appears to have resolved with treatment"; additionally, the ALJ found that neither his stomach complaints, nor his left arm injury were exacerbated by Claimant's obesity or that obesity caused any additional functional limitations for a continuous period of twelve months. (Tr. at 16)

With regard to Claimant's mental impairments, the ALJ noted that Claimant alleged he developed problems with his mental health as a result of his chronic health problems, and that he stated he underwent counseling and medication management with his mood, though his problems persisted. (Tr. at 16, 257-264) The ALJ noted that Claimant complained of problems with his temper during an examination in February 2015, and medication was prescribed although no mental status findings were reported (Tr. at 16, 474); during a follow-up visit a few months later, Claimant reported the Celexa "had significantly improved his mood." (Tr. at 16, 459) During the consultative examination with Ms. Wilson, where Claimant complained of depression and anxiety, Claimant reported being frequently irritable and having trouble sleeping, but also admitted to drinking a cup of coffee and three to four 16 ounces of tea a day. (Tr. at 16-17) The ALJ noted that Ms. Wilson observed Claimant had good eye contact; that his immediate and remote memories

---

[5] The undersigned notes these records are from St. Mary's Rehabilitation Services and dated October 2015. (Tr. at 643, 641)

were within normal limits; that his concentration, social functioning, persistence, and pace were within normal limits; and that her overall impression was major depressive disorder, single episode, moderate, with anxious distress. (Tr. at 16, 726-731) Additionally, the ALJ noted that during an examination with a treatment provider in October 2017, Claimant reported that his anxiety and depression were " 'well controlled on Cymbalta' for 'quite a while' ". (Tr. at 17, 768) Although no abnormal mental status findings were reported, the ALJ did acknowledge that Claimant did report having increased anxiety and agitation due to family problems that continued several months later and that he had been unable to afford treatment. (Tr. at 17, 762) Again, ultimately, the ALJ determined that the evidence did not show Claimant's mental impairments were severe, finding only mild limitations in his abilities in understanding, remembering, or applying information and in his ability to adapt or manage himself (Tr. at 17, 257-264, 336-385, 386-501, 726-731, 741-790, 793-799); the ALJ determined Claimant had no limitations in his abilities in interacting with others and to concentrate, persist, or maintain pace (Tr. at 17, 257-264, 386-501, 726-731, 741-790, 793-799).[6]

Next, at the third step of the sequential evaluation process, the ALJ evaluated Claimant's impairments under Section 1.00 which pertains to the musculoskeletal system. (Tr. at 18) She noted that none of the examining or treating physicians' reports showed that Claimant had evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication, as required by Section 1.04. (Tr. at 18, 508)[7] The ALJ found that Listing 3.02,

---

[6] The ALJ relied upon and referenced records including: Claimant's Function Report, dated December 26, 2016; office treatment records from Scott Orthopedic Center dated May 29, 2015 to June 6, 2016; office treatment records from Huntington Internal Medicine Group dated March 12, 2014 to September 1, 2016, March 28, 2017 to September 14, 2018, and October 12, 2018; and the consultative examination report provided by Emily Wilson, M.A., dated March 4, 2017.

[7] The ALJ cited a medical record from St. Mary's Neurosurgery dated June 15, 2016.

which concerns respiratory disorders, including chronic obstructive pulmonary disease, the evidence did not meet the Listing because the FEV1 values, the FVC values or the other relevant values were unmet. (Tr. at 18, 791-792, 797)[8] The ALJ found that Listing 4.00, dealing with the cardiovascular system, there was no evidence of cardiac enlargement, myocardial ischemia, or end organ damage to meet the Listing requirements. (Id.) Finally, with regard to Peripheral Section 11.14, the ALJ indicated the Listing was not met as the evidence did not show Claimant had peripheral neuropathies with disorganization of motor function as described in 11.04B in spite of prescribed treatment. (Tr. at 18, 359)[9]

As demonstrated by the medical evidence of record, *supra*, there is no evidence of this which would support Claimant's generalized argument that "even a cursory review of the evidence of record would conclude that the medical and mental problems, when combined, totally disable him and meet or exceed the combination of impairments listing provided by the Social Security Regulations for disability." (ECF No. 19 at 16) Later in the written decision, the ALJ acknowledged that Claimant has a history of neck and low back pain as a result of his heavy work history, where he eventually required surgical intervention with steel rods and screws. (Tr. at 19) The ALJ also recognized that Claimant alleged carpal tunnel syndrome, and that his left, non-dominant hand, is worse, and that he uses an inhaler for his COPD problems; additionally, the ALJ noted that Claimant had suffered a heart attack, requiring a stent placement, and that he suffers from coronary artery disease. (Id.) The ALJ also noted that "[s]econdary to his combined conditions, the claimant said his hands and feet stay numb." (Id.) The ALJ noted that Claimant

---

[8] The ALJ cited an office treatment note from Dr. Gudjon Karlsson, M.D., and a radiology report indicating "[n]o acute cardiopulmonary findings" dated October 12, 2018.
[9] The ALJ cited the operative report from March 15, 2016 that concerned Claimant's right carpal and cubital tunnel releases.

reported becoming overheated easily due to his coronary artery disease which causes him to feel sick, and that bending, squatting, reaching, and climbing stairs exacerbates his conditions as well as other postural activities. (Id.) Still, the Claimant advised the ALJ that he had no difficulty caring for his personal needs, is able to prepare simple meals and goes out to eat one a week, the moving once a month, and to church once a week and that he watches television to pass the time. (Tr. at 19, 252-256, 257-264)[10]

The ALJ then reviewed the evidence of record concerning these conditions, noting that Claimant had a long history of treatment from Huntington Internal Medicine Group (HIMG) for a variety of complaints over the years; this included a review of the evidence of record pre-dating the amended alleged onset date (Tr. at 19):

The ALJ observed that a record from March 2014, it was noted that Claimant underwent a heart catheterization in 2008 that revealed non-occlusive disease. (Tr. at 19, 490) During a follow-up visit in May 2015, the ALJ noted Claimant complained of bilateral hand and leg numbness for the past two years as well as persistent back pain, and that clinical testing corroborated Claimant's complaints, resulting in diagnoses severe degenerative changes in Claimant's lumbo-sacral spine and lower extremity pain likely secondary to spinal stenosis as well as mild bilateral CTS. (Tr. at 19-20, 480, 485, 368)

The ALJ also noted that when Claimant presented to the hospital with chest pain and shortness of breath, he was diagnosed with an acute inferior ST elevation myocardial infarction. (Tr. at 20, 673) A heart catheterization revealed certain abnormalities which resulted in a stent being placed. (Tr. at 20, 665) The ALJ noted that upon his return to HIMG a few weeks later, when

---

[10] The ALJ referenced Claimant's testimony and his statements from his Pain Questionnaire and Function Report dated December 26, 2016.

Claimant complained of troubled breathing, because he suffered a recent heart attack and had been prescribed blood thinners, his complaints were treated conservatively. (Tr. at 20, 476, 478) In a record from July 2015, the ALJ noted that a provider noted he was "convinced" Claimant's chest pain was non-cardiac in nature and probably muscle spasms. (Tr. at 20, 455)

The ALJ also noted that in that same month, an MRI of Claimant's lumbar spine was stable (Tr. at 20, 651); when Claimant returned to HIMG in November 2015, he complained that treatment did not help with his muscle pain, an x-ray of his cervical spine revealed degenerative changes and mild convex right cervical curvature, thus, continued medication management and physical therapy was advised (Tr. at 20, 437). The ALJ noted that Claimant then sought treatment with Dwight Saulle, M.D. for his complaints of pain in his neck into his arms and low back into his legs – an exam showed Claimant was 5/5 in strength, but with decreased sensation to pinprick in all four extremities and an antalgic gait. (Tr. at 20, 504) He was assessed with cervical spondylosis with radiculopathy and lumbar spondylolisthesis, and continued conservative treatment was advised. (Id.)

The ALJ noted that in February 2016, Claimant had complained of numbness in his hands, which was confirmed to be bilateral CTS and cubital tunnel on the right, resulting in a right CT and cubital tunnel release the following month. (Tr. at 20, 343, 359) The ALJ further noted that also in March 2016, Claimant presented to the emergency room with complaints of chest pain, though testing revealed negative cardiac markers and an x-ray revealed his heart was stable and his lungs were clear. (Tr. at 20-21, 575-585) During a follow-up exam concerning his CT release, the ALJ noted that Claimant reported doing well and his provider found his condition improved and his neurologic symptoms had resolved (Tr. at 21, 340, 339); another provider had also noted

in May 2016 that Claimant was doing " 'reasonably well from a cardiac standpoint' " (Tr. at 21, 420).

The ALJ noted that Claimant's complaints of low back and radicular pain continued unabated while he received conservative treatment, eventually, he underwent a total laminotomy with radical facetectomies for decompression and L5-S1 transforaminal lumbar interbody fusion in October 2016. (Tr. at 21, 508, 415, 579, 550) It was also noted that prior to electing surgery, Claimant reported that physical therapy did not help, though upon examination, he had decreased sensation in all four extremities, with symmetric and normal reflexes, normal strength in all extremities, and antalgic gait. (Tr. at 21, 539) Also in June 2016, Claimant complained of popping in his right wrist when opening jars, and although left CTS was assessed, his physician advised that a strengthening program would gradually resolve the condition. (Tr. at 21, 337)

Post-surgery testing revealed that Claimant had no evidence of hardware complication and slight residual anterolisthesis, but no vertebral findings were present; accordingly, Claimant was advised to continue with his lumbar brace. (Tr. at 21, 547, 510) The ALJ noted that Claimant reported "his back pain and leg symptoms had significantly improved with the surgery . . . that he was overall pleased with the procedure and the examiner noted he 'seems happy.' " (Tr. at 21, 513) By August 2017, Claimant continued to report doing well, although he wanted to undergo surgery for his neck pain once "he 'got his bills paid.' " (Tr. at 21, 781)

With regard to his cardiac and respiratory issues, the ALJ noted that Claimant had been assessed with coronary artery disease (CAD) with crescendo angina; status-post PCI of LAD and circumflex; hypertension; and hyperlipidemia, and that Claimant had intolerance to some medications in the past for his cholesterol. (Tr. at 22, 772) When Claimant returned to HIMG in

April 2018, he reported increased dyspnea with exertion, but only used Albuterol as needed; he also complained of frequent muscle spasms in his back and legs. (Tr. at 22, 756) By September 2018, the ALJ noted that Claimant reported shortness of breath with minimal exertion. (Tr. at 22, 752) The ALJ noted that in following month, Claimant had marked hyperlipidemia that had been difficult to treat due to his medication intolerance, although, the provider found that most recent cardiac testing revealed stable findings, thus it was opined that Claimant's occasional chest pain was probably not angina; a chest x-ray showed his heart size was normal and his lungs were clear. (Tr. at 22, 791-792, 797)

Following her review of the medical evidence, the ALJ considered Claimant's statements about the intensity, persistence, and limiting effects of his symptoms, finding them inconsistent with the medical record: Claimant reported that his surgical procedures relieved his CTS and back and leg symptoms and examinations since April 2018 had been normal. (Tr. at 22, 732-740, 741-790, 791-792, 793-799) The ALJ further observed that Claimant's cardiovascular condition had been stable since he received stenting, and his chest pain complaints were determined to not be cardiac in nature. (Id.) The ALJ also noted that during examinations, Claimant's strength and range of motion were normal following his procedures. (Id.) The ALJ also determined that Claimant's testimony was inconsistent with his statements in his application for benefits, as he reported being able to perform simple household chores, drive and run errands, take his daughter to and from school, complete his daily hygiene activities, got out to eat several times a week, and cut his grass with a riding lawnmower. (Tr. at 22, 257-264)

Regarding Claimant's complaints of problems with his mood and ability to concentrate and sleep throughout the night, the ALJ noted that he admitted to drinking a significant amount of

coffee during the day, which he was advised against and that he told one provider he drank coffee all day and did not stop until he went to bed. (Tr. at 22, 415) Finally, the ALJ noted that Claimant sought little treatment for his alleged mental health issues, but instead relied upon his treating doctor to prescribe medication.

Although Claimant contends that the ALJ "fails to ask how various medicines affect the claimant" (ECF No. 19 at 15), the record below shows that the ALJ did specifically ask if he had any side effects from his medication (Tr. at 38). As noted *supra*, Claimant indicated he had "itching", "no sexual conduct between me and my wife because of all the medicine for the blood pressure kills it", "tingling in [his] head", "[d]ry mouth", and "[t]hat's about it." (Id.) As pointed out by the Commissioner (ECF No. 22 at 11, n.5), the ALJ did address Claimant's intolerance to certain medications, specifically those to control his cholesterol. (Tr. at 22) Nevertheless, there is no evidence from the record that the side effects from Claimant's medications caused him any significant functional limitations that precluded all employment.

Moreover, to the extent Claimant has argued that the ALJ "completely ignored [his] testimony and medical documentation of his Irritable Bowel Syndrome [*sic*]" (ECF No. 19 at 15), the undersigned **FINDS** this contention lacks merit. While the undersigned notes that the ALJ does not explicitly mention this condition in the written decision, it is abundantly obvious that the ALJ considered Claimant's allegations of frequent diarrhea and stomach complaints (Tr. at 15-16). As pointed out by the Commissioner, the ALJ specifically asked Claimant about irritable bowel syndrome during the administrative hearing (ECF No. 22 at 12; Tr. at 48-49), which primarily concerned Claimant's frequent bathroom breaks. Also, given that the ALJ referenced portions of the medical record in her decision that pertained to Claimant's irritable bowel issues (chronic

diarrhea) (See Tr. at 16, 768, 750; See Tr. at 17, 762, 741-790; See Tr. at 22, 752, 756), it is important to recognize that the Fourth Circuit has not endorsed any duty upon and ALJ to cite everything mentioned in the record: " '[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision[.]' " Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) (quoting Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2006) (*per curiam*)); see also Call v. Berryhill, Civil Action No. 2:17-CV-02292, 2018 WL 4659342, *4 (S.D.W. Va. Sept. 28, 2018) ("The Court finds the ALJ's summaries and explanations sufficiently display a consideration of all the evidence, including that cited by Plaintiff. While this evidence was not explicitly mentioned, the holding in Reid applies to the instant case and a failure to specifically mention a single CR scan which noted `mild soft tissue swelling' in a transcript of well over 800 pages does not constitute `evidence to the contrary.' ") (Chambers, J.). As noted *supra*, while the ALJ may not have specifically mentioned "irritable bowel syndrome", she stated that she considered all the evidence of record. (See Tr. at 15 ("After consideration of the entire record. . ."); Tr. at 18 ("After careful consideration of the entire record. . ."); and Tr. at 19 ("After careful consideration of the evidence . . .")). Having so stated, this court should "take her at her word." Reid v. Commissioner of Social Sec., 769 F.3d 861, 865 (4th Cir. 2014) ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."); see also Hackett v. Barnhart, 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."); Christina W. v. Saul, Case # 4:19-cv- 00028-PK, 2019 WL 6344269, *4 (D. Utah Nov. 27, 2019) ("Plaintiff further argues that the ALJ erred in not explicitly discussing various pieces of evidence,

particularly the fact that she is participating in a structured treatment program. While the ALJ must consider all the evidence, she need not recite each piece of evidence she has considered. The ALJ stated that she carefully considered the entire record and the Court can take her at her word.").

Clearly, the ALJ considered the evidence of record with respect to Claimant's physical and mental impairments and appropriately determined that, despite the myriad of medical conditions Claimant had experienced since he alleged he became disabled, there is no indication in the record that supports his contention that his impairments met any Listing criteria, either singly or in combination. Indeed, the record contains no opinion by any physician, treating or examining, that confirms Claimant's impairments met any Listings.

Accordingly, the undersigned **FINDS** that Claimant's argument that his impairments, singly or combined, met Listing requirements lacks merit. In addition, to the extent that Claimant argues that the ALJ "failed to consider the medical records [o]f longtime treating physicians" (ECF No. 19 at 16), the undersigned **FINDS** this argument also lacks merit. In sum, the undersigned further **FINDS** that the ALJ's step three determination is supported by the substantial evidence.

<u>The Evaluation of Opinion Evidence:</u>

The Regulations provide the definition for "medical opinions":

Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions.

20 C.F.R. § 404.1527(a)(1). The Regulations further provide that "we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." <u>Id</u>. § 404.1527(b). "Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's medical opinion controlling weight . . . we consider all of the

following factors in deciding the weight we give to any medical opinion." Id. § 404.1527(c). The Regulations govern how an ALJ must analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. § 404.1527(c)(2)-(6) including: (1) Length of the treatment relationship and frequency of evaluation, (2) Nature and extent of the treatment relationship, (3) Supportability, (4) Consistency, (5) Specialization, and (6) various other factors. Medical opinions as they relate to a claimant's functional capabilities, therefore a "residual functional capacity . . . or the application of vocational factors" are determinations reserved solely to the Commissioner. Id. § 404.1527(d)(2). To that extent, an adjudicator is not bound to "give any special significance to the source of an opinion on issues reserved to the Commissioner." Id. § 404.1527(d)(3).

Claimant has explicitly stated that the ALJ "substituted her opinions for those of the claimant's treating physicians" and "erroneously relied on those opinions of non-treating and partial record-reviewing state physicians (ECF No. 19 at 17). However, the undersigned notes the record contains no opinion from any of Claimant's treating physicians that would fall under the Regulations' definition of "medical opinion." The undersigned further notes that Claimant fails to identify any opinion by any of his treating providers, let alone provide any further explanation or argument in support of this blanket statement; it appears that Claimant simply conflates diagnoses and treatment notes with opinion evidence.

Additionally, to the extent that Claimant has argued these diagnoses and treatment notes corroborate a disability finding (Id. at 15, 16), it is well known that the Regulations specifically reserve disability and work-related determinations solely to the Commissioner, and any opinions with respect to same do not enjoy any special significance. 20 C.F.R. § 404.1527(d). As noted *supra*, these records do not contain any statements concerning functional limitations or what

Claimant "can still do despite [his] impairment" that would lend themselves to a proper evaluation of opinion evidence as entertained by 20 C.F.R. § 404.1527. Further, diagnoses alone do not establish disability, because there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam) (internal citations omitted). Therefore, Claimant's bare recitation of the numerous diagnoses rendered by various providers, without any corresponding functional limitations (ECF No. 19 at 3-11), is of no moment. Nevertheless, as discussed supra, the ALJ did consider these records in rendering her decision.

Regarding the opinion evidence, to the extent Claimant argues the ALJ improperly evaluated or considered same, as pointed out by the Commissioner (ECF No. 22 at 11, n.6), the only opinions of record the ALJ explicitly considered were those prepared by the state agency consultants, Drs. Parikshak and Smith (Tr. at 22, 57-70, 71-83). The ALJ found their opinions that Claimant remained capable of light work "consistent with the objective medical record that shows improvement following treatment, with subsequently normal examinations" and gave them "great weight." (Id.) The ALJ further determined that it was necessary to limit Claimant's exposure to vibration to prevent an aggravation of his carpal tunnel syndrome, though noted his condition improved after surgery and there was no evidence of deficits in hand strength or manipulative abilities. (Tr. at 22) With respect to Claimant's argument that the ALJ erred by giving more credit to the non-examining state agency physicians' opinions because they are "non-treating and partial record-reviewing", again, Claimant neither identifies which exhibit, record or other evidence that the state agency physicians should have considered and whether any record or other evidence would have altered their opinions, nor does Claimant provide any further explanation for why he contends their opinions are deficient.

It is undisputed that the physical RFC assessments provided by Drs. Parikshak and Smith were based on the record of evidence through February 2017 and May 2017, respectively, which a significant portion of the medical records from Claimant's treating physicians. (Tr. at 57-70, 71-83) This evidence also included Claimant's own Pain Questionnaire and Functional Report. (Tr. at 252-256, 257-264) Regardless, the evidence received by both state agency physicians was insufficient to justify any significant change to their opinions rendered at either the initial or reconsideration levels of review.[11] However, of greater importance here is that the ALJ had the opportunity to review all of the evidence of record prior to rendering her decision. The ALJ specifically noted that Claimant's limitations, including his subjective complaints, were accommodated in the RFC, and underscored the evidence showing that while Claimant underwent treatment for COPD, CAD, CTS, and degenerative disc disease with surgical intervention, "he has recovered well and he reports medication controls many of his symptoms." (Tr. at 22-23) The ALJ has discharged her duty pursuant to Section 404.1527(c) and provided an adequate explanation allowing for meaningful review. See, DeLoatche v. Heckler, 715 F.2d 148, 150 (4th Cir. 1983).

In short, Claimant's contention that the opinions provided by the state agency consultants were based only on their review of a "partial record", and therefore the ALJ was erroneous to rely

---

[11] It is noteworthy that the ALJ's RFC assessment nearly mirrors those provided by the state agency medical consultants, although the ALJ provided additional restrictions concerning Claimant's exposure to temperature extremes, vibration, fumes, odors, dust, gas, and poor ventilation, as well as completely restricting Claimant from hazards, including unprotected heights and moving machinery. (Tr. at 18) The undersigned further notes that Claimant mentions briefly in his concluding argument that the ALJ's decision should be remanded so that "a more accurate hypothetical question" can be posed to the vocational expert in light of Claimant's physical and mental limitations (ECF No. 19 at 17), however, Claimant neither identifies any specific limitation that the ALJ ignored in her RFC analysis, nor provides any explanation as to how the hypothetical question posed by the ALJ is deficient. Accordingly, given the lack of any argument supporting this position, Claimant has waived any argument on this specific issue. Grayson O Company v. Agadir International LLC, 856 F.3d 307, 316 (4th Cir. 2017).

upon same, is without merit.[12] Accordingly, the undersigned **FINDS** the ALJ's evaluation of the opinion evidence is supported by substantial evidence.

Finally, the undersigned further **FINDS** that in light of the ALJ's analysis of the evidence of record, the final decision denying Claimant's applications for benefits is supported by the substantial evidence.

## Recommendations for Disposition

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Claimant's request for reversal or remand (ECF No. 18), **GRANT** the Defendant's request to affirm the decision below (ECF No. 22), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from this Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Robert C. Chambers, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

---

[12] To the extent that Claimant takes issue with the ALJ's RFC assessment, as with the ultimate determination of disability, is solely within the adjudicator's purview, not a physician's. See 20 C.F.R. §§ 404.1545(a), 404.1546(c). Moreover, the ALJ was entitled to rely upon the opinions of the state agency consultants, as they are considered "highly qualified and experts in Social Security disability evaluation." See Id. § 404.1513a(b)(1).

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. <u>Snyder v. Ridenour</u>, 889 F.2d 1363, 1366 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), <u>reh'g denied</u>, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); <u>Wright v. Collins</u>, 766 F.2d 841 846 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Chambers, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: November 30, 2020.



Omar J. Aboulhosn
United States Magistrate Judge